IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF MYAH C. & MARIAH C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF MYAH C. AND MARIAH C., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ALONDRA C., APPELLANT, AND TERRANCE A., APPELLEE.

Filed February 10, 2026.    No. A-25-519.

Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Emma J. Lindemeier for appellant.

Donald W. Kleine, Douglas County Attorney, and Hailey Russell for appellee State of Nebraska.

Christine P. Costantakos, guardian ad litem.

RIEDMANN, Chief Judge, and PIRTLE and FREEMAN, Judges.

RIEDMANN, Chief Judge.

## I. INTRODUCTION

Alondra C. appeals from the order of the separate juvenile court of Douglas County that terminated her parental rights to her daughters, Myah C. and Mariah C. Myah and Mariah's father's parental rights were also terminated, but he is not involved in this appeal and will not be further discussed. Following our de novo review, we affirm the judgment of the juvenile court.

## II. BACKGROUND

Myah, born in January 2018, and Mariah, born in November 2018, were removed from their mother's care in April 2022, and have been in out-of-home placement since that time. In

December 2024, the State filed a motion to terminate Alondra's parental rights under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The hearing on the motion to terminate Alondra's parental rights was held on May 30 and June 11, 2025.

### 1. CIRCUMSTANCES OF REMOVAL

The children were removed after law enforcement was called to their home in April 2022 due to concerns that Alondra was assaulting her mother and brother. The investigation showed that Alondra had assaulted her mother and brother, as well as committed destruction of property. Myah and Mariah were removed from the home because Alondra was being arrested. While being arrested, Alondra told law enforcement that in January, she observed one of her daughters performing oral sex on Alondra's father. Alondra stated she had earlier denied what occurred because her mother had "threatened to kick her out" of their residence if Alondra reported it.

### 2. ADJUDICATION

The State filed a petition alleging that Myah and Mariah were children within the meaning Neb. Rev. Stat. § 43-247 (Cum. Supp. 2024). Myah and Mariah were adjudicated in September 2022. The juvenile court found that Myah and Mariah were children within the meaning of § 43-247 because Alondra was incarcerated, and that Alondra's use and/or possession of drugs (insofar as over the counter drugs, specifically cold medication) and/or alcohol placed the children at risk of harm.

### 3. GOALS AND COURT ORDERS

In December 2022, Alondra was ordered to (1) obtain and maintain safe, stable, and adequate housing; (2) obtain and maintain a legal, stable source of income and provide proof of such to her case manager; (3) create a monthly budget; (4) meet with her case manager monthly; (5) abstain from the use/possession of controlled substances not prescribed by her doctor; (6) not consume over the counter medications not prescribed by her doctor; (7) not engage in conduct or behavior which would result in incarceration; (8) participate in individual therapy to address major depression, generalized anxiety, post-traumatic stress disorder, and attention deficient hyperactivity disorder; and (9) complete a chemical dependency evaluation. In April 2023, the court also ordered Alondra to enroll in and complete a residential treatment program and take affirmative steps to obtain consistent treatment from a psychiatrist.

The reports of the Department of Health and Human Services (DHHS) for October 2024 and April 2025 set several goals for Alondra. She was to lead a drug and alcohol-free life, be free of illegal behaviors, provide a safe and suitable living environment for her children, including how to provide for their emotional and educational needs, address her own mental health needs, have safe and stable housing and a legal source of income and demonstrate this by a walkthrough of her residence and providing paystubs.

#### (a) Housing

Sandra Pinkney became the family's caseworker in August 2023. When Pinkney became case manager, she conducted a walkthrough of Alondra's home each month, and in November 2024 became concerned about an infestation of cockroaches. Alondra explained that the building

was being torn down, that the apartment had been sprayed for cockroaches, and that she was working to keep her home as clean as possible.

Pinkney advised Alondra to start looking for other housing options. Although there was some delay due to issues outside Alondra's control, she was able to obtain a voucher from the local housing authority to assist her in obtaining a new residence. However, Alondra had to obtain an extension so that voucher would not expire because she had not started looking for a new residence in a timely manner. Alondra did not obtain a new residence until March 2025, after which Pinkney conducted a walkthrough and had no concerns.

### (b) Employment

Alondra was employed throughout the case, working at temporary jobs if she did not have permanent employment. However, despite the court order for her to provide proof of her income, she failed to do so until April 2025.

### (c) Drug and Alcohol Use/Testing

In June 2020, DHHS had received a report that Alondra was admitted to a hospital due to the use of methamphetamine. Alondra had collapsed and hit her head while picking up the children from daycare. Although Alondra completed treatment for drug and alcohol use, she did not follow up with other recommendations, such as attending a certain number of support group meetings each week. According to Pinkney, Alondra typically missed one or two drug tests each month. Between September 2022 and April 2025, Alondra missed 41 tests. Alondra stated that she had missed drug tests due to her phone being silenced and missing the call. Some of her tests were presumptively positive for substances, including oxycodone, benzodiazepines, morphine opiates, and alcohol. However, the only tests that were lab confirmed as positive were for alcohol. Alondra relapsed on alcohol in September or October 2024. At the termination hearing, Alondra testified she had not used methamphetamine in 4 years and had not used alcohol in 9 months.

### (d) Mental health

During the case, Alondra was receiving therapy. She had switched to a new therapist so that her treatment providers were all in one building. Alondra initially testified that she found a new therapist because her former therapist was cancelling appointments, Alondra was missing appointments due to traffic, and Alondra felt they did not really connect. However, on cross-examination, Alondra admitted that her former therapist had discharged her from therapy due to missing sessions.

Alondra's mental health issues caused her to miss visits with the children. Pinkney recalled an instance when Alondra missed a visit with her children because she overslept and was depressed because she did not get to tell her father happy birthday. Alondra missed visits around the time of the termination hearing because she had major depression and PTSD. On days when she was suffering from depression, Alondra stated that she wanted to be in bed all day, not be around anyone, and did not want to be around her children when she was sad. To address her depression since missing the recent visits, Alondra stated that she was focusing on herself, had obtained a new therapist, and had recently started new medication.

### (e) Visitation

Visits between Alondra and the children were supervised the entire time Pinkney was on the case. When she was first assigned the case, Pinkney recommended unsupervised visitation, but after taking the recommendation under advisement, the juvenile court ordered visits to remain agency supervised. Pinkney reported that Alondra would miss one or two visits per month, but that closer in time to the termination hearing, she had missed the six most recent visits. In addition to missing visits due to her mental health issues, Alondra missed another visit and stated she did not respond to messages from the visitation worker because her phone was silenced. Pinkney stated that visitation notes reflected that Alondra felt overwhelmed when the children were not listening to her. Alondra did not always keep the children in her line of eyesight, and it was hard for her to redirect them during visits.

### (f) Myah and Mariah

When the children were first placed in foster care they could not put on shoes or go to the bathroom by themselves. (They were approximately 3½ and 4 years old at the time). By the time of the termination hearing 3 years later, they could brush their teeth, wash their faces, put on clothes, and had become very independent, though Mariah still needed a little help. Closer in time to their removal from Alondra's care, Myah would be upset when Alondra cancelled a visit, but at the time of the termination hearing that had changed. Myah would state that she wondered if Alondra was actually sick, or question whether Alondra just did not want to take care of them. Mariah did not show any emotions and seemed not to care when a visit was cancelled. An April 2025 court report noted that when returning from visits with Alondra, Mariah was observed "acting baby-like and not speaking and grunting as well as pointing at things she wants." Pinkney believed it was in the children's best interests that Alondra's parental rights be terminated.

### 4. JUVENILE COURT ORDER

The juvenile court found clear and convincing evidence that Myah and Mariah were children within the meaning of § 43-292(2), (6), and (7). It also found clear and convincing evidence that it was in Myah and Mariah's best interests that Alondra's parental rights be terminated.

## III. ASSIGNMENTS OF ERROR

Alondra assigns, restated, that the juvenile court erred in (1) terminating her parental rights because the State failed to prove a statutory basis for removal under § 43-292(2), (6), and (7) and (2) terminating her parental rights because the State failed to prove termination was in Myah and Mariah's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. STATUTORY BASIS

Alondra assigns that the juvenile court erred in terminating her parental rights because the State failed to prove a statutory basis for removal under § 43-292(2), (6), and (7). To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

Section 43-292(7) states that the court may terminate all parental rights between the parents and a juvenile when the court finds that "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." This section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Here, the evidence showed that Myah and Mariah were removed from Alondra's care in April 2022 and had remained in out-of-home placement since that time. The petition to terminate Alondra's parental rights was filed in December 2024. At that time, Myah and Mariah had been in out-of-home placement for nearly 20 months. This was sufficient to meet the requirements of § 43-292(7); therefore, a statutory basis for termination was proven by clear and convincing evidence. See *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023) (existence of statutory basis alleged in § 43-292(7) should be determined as of date petition or motion to terminate filed).

Because grounds existed for termination under § 43-292(7), we need not address Alondra's argument pertaining to lack of evidence for termination under § 43-292(2) and (6). See *In re Interest of Mateo L. et al., supra*.

### 2. BEST INTERESTS

Alondra assigns that the juvenile court erred in terminating her parental rights because the State failed to prove termination was in Myah and Mariah's best interests. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Cameron L. & David L.*, *supra*. See, also, § 43-292.

A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *In re Interest of Cameron L. & David L., supra.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a

parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id*.

Alondra made some progress on many of her goals and court orders throughout this case. However, she never fully progressed to a point where she could have unsupervised visits with her children, let alone have them safely returned to her care. Alondra would be close to fulfilling a specific requirement but would not take the final steps to achieve that goal. Although employed, she failed to provide proof of this employment as ordered until April 2025. Although able to successfully obtain safe housing, Alondra failed to do so in a timely manner, requiring her to obtain an extension for her housing voucher.

As it related to her mental health, Alondra stated she had stopped seeing a particular therapist because they were both cancelling appointments and were not connecting. However, she later acknowledged that she was discharged due to missing appointments. Alondra missed several visits with her children around the time of the termination hearing because she was so depressed she could not get out of bed. Alondra had obtained a new therapist by the time of the termination hearing but had already missed visits with her children due to failing to fully address her mental health issues. Alondra missed drug tests, reportedly because her phone was silenced. This was also the reason Alondra gave for missing messages from a visitation worker when Alondra failed to attend a visit. Ensuring her phone was not silenced so that she would not miss calls was a step that was easily within her control, but Alondra failed to take measures to remedy this issue.

Alondra also failed to recognize the danger her father posed to her children. Despite stating that her father had abused her in the past and witnessing one of her children performing oral sex on her father in January 2022, Alondra continued to have a relationship with him until close in time to the filing of the motion to terminate her parental rights. Her reasons for this continued relationship were that her father had heart issues, did a lot for her financially, and she only had one father. At the termination hearing, Alondra stated she last spoke with her father in December and that she last had contact with him on January 1, 2025. Continuing to have a relationship with her father, who had shown himself a danger to Alondra and her children, displays a lack of protective capacity toward her children. It also shows a lack of ability to recognize when a person or situation is harmful to her children.

Myah and Mariah have made progress since being in out-of-home placement. When first placed in foster care they could not put on shoes or go to the bathroom by themselves. By the termination hearing, they could accomplish these tasks. Although when first removed from Alondra's care, Myah became upset when Alondra missed a visit, by the time of the termination hearing she would question Alondra's reasons for cancelling. Mariah appeared not to care when a visit was cancelled and displayed concerning behaviors after returning from visits.

We acknowledge that Alondra has made progress and taken positive steps. She stopped having a face-to-face relationship with her father, had safe housing, was employed, and was addressing her mental health. However, after 3 years, Alondra was still not in a position where she could safely care for Myah and Mariah. Although Alondra loves her children, she has not shown she is willing or able to place herself in a position to have them safely returned to her custody and care.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of*

*Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *id*. We find Alondra to be unfit, and that termination of her parental rights to be in the best interests of Myah and Mariah.

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Alondra's parental rights.

AFFIRMED.